# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 275 | **DATE** | February 10, 2003 |
| **CASE TITLE** | *United States v. Edwin Oliva and Edward Mejia* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, the Court DENIES Defendants' motions to suppress their arrest [45–1], the search of their car [44-1], and their pre and post arrest statements [45-2]. The Court also DENIES Defendants' request for an evidentiary hearing on the above motions. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | | FEB 1 2 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | 60 |
| | Copy to judge/magistrate judge. | | | | |
| RTS | courtroom deputy's initials | | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Hon. Blanche M. Manning |
| v. ) | |
| ) | 02 CR 275 |
| EDWIN OLIVA and EDWARD MEJIA ) | |

DOCKETED
FEB 1 2 2003

## MEMORANDUM AND ORDER

On June 19, 2002, a federal grand jury returned a three-count indictment against Defendants Edwin Oliva and Edward Mejia, alleging that they conspired with each other and others to intentionally possess with intent to distribute more than 500 grams of cocaine and used and carried a firearm in furtherance of these actions, in violation of 18 U.S.C. §§ 841, 846, and 924. The present matter comes before the court on Defendants' motions to suppress their arrest, search of their vehicle, and pre and post arrest statements.

### BACKGROUND[1]

On March 21, 2002, an officer, with the Drug Enforcement Agency's ("DEA") Chicago task force, received information from a confidential informant ("CI"), who the agent had just met within the past 24 hours. The CI stated that he could obtain cocaine from an individual named "Ed." The CI could not provide any other information on Ed, other than that he had conducted drug transactions with Ed in the past and that Ed hid his cocaine in a secret compartment located in the vehicle which he drove to the drug transaction.

---

[1] The Background facts are taken from the transcript of the preliminary and detention hearing and reports by the agents who arrested Defendants.



The CI placed four recorded telephone calls to Ed. In the first call, the CI asked Ed if "he was straight right now" and whether he could "hit" him with "three." Ed responded that he could "grab three" at "nineteen-five." In a second conversation that same day, Ed stated that he "was talking to [his] cousin" and that he could only get "two" at "twenty" each. In a later conversation, the CI gave Ed directions to an address in Chicago where the alleged transaction was to proceed.

Although the word "cocaine" was not explicitly mentioned in the above conversations, the officer testified that, based on his experience working with the DEA task force, Ed and the CI had reached an agreement for the sale of 2 kilograms of cocaine at $20,000 per kilogram.

After setting up the drug transaction, the CI proceeded to the agreed upon location to wait for Ed to arrive with the cocaine. The police were also waiting and observing this location. Later that day, Ed called the CI to say that he would arrive at around 3:00 p.m. At approximately 2:55 p.m., the police observed a car in the vicinity which briefly stopped in front of the address of the alleged drug buy. The car then proceeded down the street where it made a left hand turn and parked on the corner. Two Hispanic males (later identified as Defendants) then got out of the car and proceeded to the agreed upon address. At this point the CI called the police and stated that he recognized one of the men as Ed but had never seen the other man. The CI also stated that he was concerned that because Ed had brought someone with him that they would be armed with guns.

After the two men reached the agreed upon address and knocked at the door, eight police officers, wearing wind breakers identifying them as law enforcement agents, approached the two individuals. With their guns drawn, the police identified themselves and ordered the men to raise

their hands in the air. Neither subject complied with this instruction and one of the men (Defendant Oliva) put his hand down toward his waistband. At this point, the police noticed what appeared to be a gun sticking out of Defendant Oliva's waistband and the outline of a gun in Defendant Mejia's waistband. The police then subdued Defendants with physical force and arrested them.

After subduing Defendants, the police proceeded to the car that Defendants drove to the alleged drug buy.[2] Accompanying the police was a narcotics detecting dog named "Duke," who is a certified drug detecting dog with a 90% accuracy rate and more than 100 positive alerts. While walking around the car, Duke alerted to the front passenger side door. The police then let Duke into the car where he alerted to the passenger side air bag. Upon searching the area of the passenger side air bag, the police discovered a "mechanically operated hidden compartment or trap" which contained two packages containing what was later determined to be 1,956 grams of cocaine.

After being handcuffed and placed under arrest, Defendants were driven separately to the police station. On the drive to the police station, one of the agents told Defendant Mejia "to just think about what happened, that [the agent] didn't want to talk to him right now. When we got back down to our DEA facilities, he [Mejia] could decide whether or not he wanted, you know what he wanted to do." Mejia then told the officer that he did not know anything about the drugs. He stated that he went to lunch with his cousin (Oliva) and after lunch Oliva gave him a gun and asked him to come to the location where they were arrested.

---

[2] During the arrest, other police officers maintained constant surveillance on Defendants' car.

Defendants were subsequently indicted for conspiracy of intent to possess and distribute more than 500 grams of cocaine and use of a firearm in furtherance of this conspiracy, in violation of 18 U.S.C. §§ 841, 846, and 924. The trial in this matter is set to begin on February 11, 2003. The present matter comes before this Court on Defendants' motions to suppress.

## DISCUSSION

Defendants have moved to suppress: (I) their arrest; (II) the search of their vehicle; and (III) pre and post arrest statements. The Court will address each of these motions in turn.

First, however, the Court will discuss Defendants' request for an evidentiary hearing. In requesting an evidentiary hearing, the defendant bears the burden of showing that there are disputed issues of material fact. United States v. Woods, 995 F.2d 713, 715 (7th Cir. 1993). In making this showing, the defendant must present detailed facts showing that they are entitled to relief. United States v. Randle, 966 F.2d 1209, 1212 (7th Cir. 1992).

Here, Defendants have not shown that there are any disputed facts which if found in their favor would entitle them to relief. Instead, Defendants simply argue that based on the above facts, which are not disputed by the parties, that the police did not have probable cause to arrest them or search their car. This is purely a matter of law, which this Court can decide based on the facts presently before it. Accordingly, Defendants' request for an evidentiary hearing is denied.

### I. Motion to Suppress Arrest

Defendants have moved to suppress their arrests on the grounds that the police did not have probable cause to arrest them because the information from the CI was unreliable.

To arrest a criminal suspect without an arrest warrant, the police must have probable cause, "under the totality of the circumstances, to reasonably believe that" the suspect committed

or is in the process of committing a criminal offense. United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir. 1995). In determining whether the police had probable cause, the court must make "a practical, commonsense decision whether, given all of the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in [a] particular place." Id. This determination requires more than "mere suspicion," but does not "reach the level of virtual certainty." Id.

If the probable cause is based on a tip from a confidential informant, the tip must be shown to be reliable. Id.; United States v. Rucker, 138 F.3d 697, 700 (7th Cir. 1998). The reliability of an informant's tip can be shown by a past record of providing reliable information or through independent confirmation or observation by the police. Id.; United States v. Navarro, 90 F.3d 1245, 1253-54 (7th Cir. 1996).

In a case similar to the present matter, United States v. Segars, 31 F.3d 655, 659 (8th Cir. 1994), the Eighth Circuit affirmed a decision that the police had probable cause based on a tip from an informant, with no history of providing information, and the observations made by the police subsequent to the tip. The informant in Segars, after being arrested, stated that he was expecting a delivery of drugs at his apartment early the next day and that the drug courier's car would have Michigan license plates. Id. at 657. The police then accompanied the informant back to his apartment where the informant received at least two telephone calls asking if he had been arrested and stating that the shipment would arrive late. Id. About four hours later, at 5:30 a.m., the police observed a car with Michigan license plates park near the informant's apartment. Id. The police then observed several men get out of the car and walk to the informant's apartment. Id. After the men from the car knocked on the informant's door, the police, who

were wearing police jackets, approached the men with their guns drawn and stated that they were the police and instructed the men to raise their hands. Id. After at least one of the men refused to comply, the police subdued and arrested them. Id. Affirming the warrantless arrest, the court held that the police had probable cause under the circumstances based on the informant's tip and the fact that the police observed the telephone calls and the defendants arrive in the type of car and at the time the informant predicted they would. Id. at 659.

Here, Defendants contend that the CI's information was not reliable because the police had just met him and had never received any prior information from him before. While this in of itself might not be probable cause, this Court is required to look at not only the tip but at the totality of the circumstances including whether the police independently confirmed any of the information provided by the CI.

After receiving the tip from the CI, the police had him place four recorded telephone calls to "Ed," who was later identified as Defendant Oliva. As discussed in detail above, in these calls, the CI and Ed negotiated the sale of two kilograms of cocaine for $20,000 per kilogram. Ed also mentioned that he was getting the drugs from his cousin. The CI gave Ed directions to an address in Chicago where the transaction was to proceed. The CI and the police then proceeded to this address to await Ed. Ed called the CI to say that he would arrive at around 3:00 p.m. At approximately 2:55 p.m., the police observed a car in the vicinity which briefly stopped in front of the address of the alleged drug buy. The car then proceeded down the street where it made a left hand turn and parked on the coroner. Two Hispanic males (later identified as Defendants) then got out of the car and proceeded to the agreed upon address. At this point the CI called the police and stated that he recognized one of the men as Ed but had never seen the

other man. The CI also stated that he was concerned that because Ed had brought someone with him that they would be armed with guns.

After the two men reached the address and knocked at the door, eight police officers, wearing wind breakers identifying them as law enforcement agents, approached the two individuals. With their guns drawn, the police identified themselves and ordered the men to raise their hands in the air. Neither subject complied with this instruction and one of the men (Defendant Oliva) put his hand down toward his waistband. At this point, the police noticed what appeared to be a gun sticking out of Defendant Oliva's waistband and the outline of a gun in Defendant Mejia's waistband. At this point, the police subdued Defendants with physical force and placed them under arrest.

Based on the totality of the circumstances, this Court concludes that the police had sufficient independent confirmation (the 4 telephone calls between the CI and Ed, Ed arriving at the agreed upon location at the agreed upon time, and the CI's confirmation that one of the men in the car was Ed) of the CI's tip to give them probable cause to arrest Defendants or as explained below for a Terry Stop. Furthermore, once they saw that the Defendants were carrying handguns, the police had probable cause to arrest Defendants for violating 720 ILCS 5/24-1(a)(4), which make it illegal for persons to carry concealed handguns in Illinois.

A police officer, who lacks probable cause for an arrest, may stop a suspect to briefly investigate the circumstances provoking the officer's suspicion that the suspect was or is about to engage in criminal activity (a Terry Stop). Terry v. Ohio, 392 U.S. 1 (1968). To make a Terry Stop, the officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion that the person is or

was committing a crime. Id. at 21; United States v. Vega, 72 F.3d 507, 515 (7th Cir. 1995). To determine if the officer had a "reasonable suspicion" of criminal activity, the court must examine the "totality of the circumstances as they appeared to the officer at the time of the stop." United States v. Ocampo, 890 F.2d 1363, 1368 (7th Cir. 1989). Like the determination for probable cause, the officer may rely on a tip from an informant which is sufficiently reliable. See id.

In making a Terry Stop, the fact the police drew their weapons does no turn the stop into an arrest. Vega, 72 F.3d at 515; Ocampo, 890 F.2d at 1368. Instead, the court must examine whether the use of a weapon was reasonable under the circumstances. Id. at 1369. In Ocampo, the Seventh Circuit held that it was reasonable for a police officer to draw his weapon in the course of a Terry Stop for suspicion of drug dealing, given the officer's experience working drug crimes and the fact that "[i]t is beyond dispute that drug traffickers are often armed and dangerous and that they sometimes shoot policemen." Id.

Here, as discussed above, the CI's tip and the observations by the police provided the police with "reasonable suspicion" that Defendants were engaged in criminal activity. The fact the officers drew their guns did not turn this stop into an arrest given that the officers were part of a DEA drug task force and the CI, who had delt with Ed before, believed that Ed would be armed. Therefore, the officers properly conducted a Terry stop, and once they saw that Defendants were armed, had probable cause to arrest them.

Accordingly, Defendants' Motion to Suppress the Warrantless Arrest is DENIED.

## II. Motion to Suppress the Warrantless Search of the Vehicle

Defendants have also moved to suppress the warrantless search of the vehicle which they drove to the location of the alleged drug deal. According to Defendants, the police did not have probable cause to search the vehicle.

The police may search an automobile without a warrant if the search is supported by probable cause. United States v. Ledford, 218 F.3d 684, 688 (7th Cir. 2000). To determine if the police had probable cause, the court should examine the totality of the circumstances to assess if there was a "fair probability" that contraband was present in the car. Id. The search may extend to any part of the car in which "contraband may be concealed." Id. Where the police have a drug sniffing dog, the dog's alert to the presence of drugs supplies sufficient probable cause that drugs are present. United States v. Jones, 275 F.3d 648 (7th Cir. 2001); United States v. Finke, 85 F.3d 1275, 1282 (7th Cir. 1996). To initiate a canine sniff test, the police do not need probable cause because a sniff test is not a search. United States v. Vasquez, 909 F.2d 235, 238 (7th Cir. 1990).

Here, the police conducted a sniff test of Defendants' car with certified drug detecting dog with a 90% accuracy rate and more than 100 positive alerts. While walking around the car, the dog alerted to the front passenger side door. The police then let the dog into the car where he alerted to the passenger side air bag. Upon searching the area of the passenger side air bag, the police discovered a "mechanically operated hidden compartment or trap" which contained two packages containing what was later determined to be 1,956 grams of cocaine. Accordingly, given the positive alert for drugs by the dog and the facts that Defendants set up an alleged drug deal and arrived at the arranged upon location at the agreed time with guns but no drugs, there was a fair probability that drugs were contained in the car. Moreover, the CI stated that Ed

would hide the cocaine in a hidden compartment in the car. Therefore, the Court DENIES Defendants' Motion to Suppress the Warrantless Search.

## III. Motion to Suppress Pre and Post Arrest Statements

### A. Pre-Arrest Statements

Defendants have moved to suppress the statements made by Oliva to the CI on the grounds that they were not coconspirator statements and are hearsay. These statements as they relate to Oliva are admissible as statements of a party opponent under Federal Rule of Evidence ("FRE") 801(d)(2)(A). As for the use of these statements against Mejia, they will be admissible if they are found to be coconspirator statements under FRE 801(d)(2)(E). Pursuant to United States v. Santiago, 582 F.2d 1128 (7th Cir.1987), the Government has filed a written proffer supporting the admissibility of Oliva's statements against Mejia.

Under FRE 801(d)(2)(E), statements made by a coconspirator of a defendant during the course of and in furtherance of the conspiracy are not hearsay when offered against a defendant. Before allowing coconspirator statements into evidence, however, the government must demonstrate by a preponderance of the evidence that it is "more likely than not" that: "(1) a conspiracy existed, (2) the defendant and the declarant were members thereof, and (3) the proffered statements were made during the course of and in furtherance of the conspiracy." United States v. Cox, 923 F.2d 519, 516 (7th Cir.1991). In making this determination, the court "may examine the hearsay statements sought to be admitted." Bourjaily v. United States, 483 U.S. 171, 181 (1987).

In determining whether a statement was made "in furtherance" of the conspiracy, all that is necessary is a reasonable basis upon which the court could conclude that the statement

-10-

furthered the objectives of the conspiracy. United States v. Shoffner, 826 F.2d 619, 628 (7th Cir. 1987). Under this standard, a statement can be considered "in furtherance of the conspiracy" even though it is susceptible to different interpretations or was not made exclusively (or even primarily) to further the conspiracy's objectives. Id.

So long as a statement is "part of the information flow between conspirators intended to help each perform his role" it is admissible. United States v. Van Daal Wyk, 840 F.2d 494, 499 (7th Cir. 1988). Statements that further the objectives of a conspiracy include those that: (1) are an attempt to recruit potential co-conspirators, see Shoffner, 826 F.2d at 628; (2) seek to control damage to an ongoing conspiracy, see Van Daal Wyk, 840 F.2d at 499; (3) are made to keep co-conspirators advised of the progress of the conspiracy, see United States v. Potts, 840 F.2d 368, 371 (7th Cir.1987); and (4) attempt to conceal the conspiracy, see United States v. Kaden, 819 F.2d 813, 820 (7th Cir.1987). Moreover, conversations dealing with "topics [such] as selling [drugs], arranging delivery and payment . . . have uniformly been held to have been made in furtherance of the conspiracy." Van Daal Wyk, 840 F.2d at 499.

Here, Mejia's only basis for the exclusion of the coconspirator statements are that "the only other person connected to the alleged conspiracy was the confidential informant," and therefore, there was not a conspiracy. While Mejia is correct in that the CI cannot be included as part of the conspiracy, the Government's position is that Oliva and Mejia were the two conspirators.

After reviewing the Government's Santiago proffer, this Court finds that the Government has shown by a preponderance of the evidence that it is "more likely than not" that Oliva and Mejia conspired to sell cocaine to the CI and that the recorded conversations between the CI and

-11-

Oliva were in furtherance of the conspiracy. The recorded conversations show that the CI and Oliva were negotiating for the sale of kilogram sized quantities of cocaine. During this conversation, Oliva stated that after speaking with his "cousin" he would only be able to provide the CI with two kilograms of cocaine. When the CI complained about the price per kilogram, Oliva stated that it was not his fault, but his cousin who set the prices. After setting the price and quantity, Oliva and Mejia arrived at the agreed upon location at the appropriate time with guns and 1,956 grams of cocaine.

Accordingly, the Court DENIES the Motion to Suppress the Pre-Arrest Statements and rules that Oliva's recorded conversations with the CI are conditionally admissible pursuant to Rule 801(d)(2)(E), subject to proof of the conspiracy at trial. See Santiago, 582 F.2d at 1131; Cox, 923 F.2d at 526.

### B. Post-Arrest Statements

Defendants have also moved this Court to suppress a statement Mejia made in the police car after being arrested on the way to the police station but not yet Mirandized. A criminal suspect who is both in "custody" and subject to "interrogation" must be informed of his rights under Miranda v. Arizona, 384 U.S. 436, 444 (1966). United States v. Abdulla, 294 F.3d 830, 834 (7th Cir. 2002). Here, it is undisputed that Mejia was in custody when he made the alleged statements. Thus, the only question before this Court is whether he was subject to interrogation at that time.

To determine whether a suspect was subject to interrogation, the court should examine whether "a reasonable objective observer" would have believed that the questions posed by the police were "reasonably likely to elicit an incriminating response." Id. (citing Rhode Island v.

Innis, 446 U.S. 291 (1980)). "Routine booking questions" are not considered questions which would be intended to elicit an incriminating response. United States v. Monzon, 869 F.2d 338, 342 (7th Cir. 1989).

Here, after being placed under arrest, on the drive to the police station, one of the agents told Defendant Mejia "to just think about what happened, that [the agent] didn't want to talk to him right now. When we got back down to our DEA facilities, he [Mejia] could decide whether or not he wanted, you know what he wanted to do." Mejia then told the officer that he did not know anything about the drugs. He stated that he went to lunch with his cousin (Oliva), and after lunch, Oliva gave him a gun and asked him to come to the location of the arrest. Given that the officer told Mejia not to say anything until they reached the police station, this Court finds that the statement by the officer was not "reasonably likely to elicit an incriminating response," and therefore, not "interrogation" requiring Miranda warnings. Accordingly the Court DENIES Defendants' motion to suppress Mejia's post-arrest statements.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motions to suppress their arrest [45–1], the search of their car [44-1], and their pre and post arrest statements [45-2]. The Court also DENIES Defendants' request for an evidentiary hearing on the above motions. It is so ordered.

**ENTER:**

*Blanche M. Manning*
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

**DATE:** 2-10-03